**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| STEPHANIE RICKETTS, as parent of L.G., a minor,<br>            Plaintiff<br><br>            v.<br><br>TITUSVILLE AREA SCHOOL DISTRICT and ROCHELLE CRESSMAN,<br>            Defendants. | )<br>)<br>)   **C.A. No. 21-129 Erie**<br>)<br>)<br>)   **District Judge Susan Paradise Baxter**<br>)<br>)<br>)<br>) |

**MEMORANDUM OPINION**

### I.    INTRODUCTION

#### A.    Relevant Procedural History

Plaintiff Stephanie Ricketts, an adult resident of Crawford County, Pennsylvania, brings this personal injury action on behalf of her minor child, L.G. ("LG"), against Defendants Titusville Area School District ("TASD") and Rochelle Cressman ("Cressman"), an adult individual who, at all relevant times was employed as a teacher by TASD. Plaintiff alleges a claim of deliberate indifference under the fourteenth amendment to the United States Constitution against both Defendants, and an implicit claim of state-created danger against Defendant TASD, as well as state law claims of assault and battery and intentional infliction of emotional distress against Defendant Cressman, arising from Cressman's sexual abuse of LG from September 2018 through April 2019. As relief for her claims, Plaintiff seeks to recover compensatory and punitive damages.

After the parties completed discovery, Defendant TASD filed a motion for summary

judgment as to Plaintiff's Fourteenth Amendment deliberate indifference claim, and her implicit claim of state-created danger, against it [ECF No. 52].[1] Plaintiff has filed a brief in opposition [ECF No. 62], to which TASD has filed a reply [ECF No. 72], and Plaintiff has filed a sur-reply [ECF No. 76]. This matter is now ripe for consideration.

### B.     Relevant Factual History[2]

TASD is a public school district located in Titusville, Pennsylvania. (ECF No. 53, at ¶ 1). Cressman began working for the TASD in 2009 as a physical education teacher at Titusville High School, and was subsequently transferred to Titusville Middle School ("TMS") to receive professional mentoring under the guidance of a more senior teacher and head of the athletic department. (Id. at ¶ 5).

During his seventh grade school year, LG moved to Titusville to live with Plaintiff[3] and began attending TMS on April 1, 2018. (Id. at ¶¶ 10-11). At the end of LG's seventh grade year, Cressman asked him to work for her over the summer of 2018, mowing lawns and performing other maintenance work at her home and other rental properties. (Id. at ¶ 12). Cressman then called Plaintiff to get permission for LG to work for her, and Plaintiff gave her consent, but indicated that she was unable to provide transportation because of her working hours. (Id. at ¶¶

---

[1] Defendant Cressman has not filed a dispositive motion as to Plaintiff's claims against her, so such claims will not be addressed herein.

[2] The facts recited herein are gleaned from the parties' concise statements of material facts [ECF Nos. 53, 68 at ¶¶ 97-185] to the extent the same are admitted and/or substantially supported by the documentary evidence of record.

[3] Before moving to Titusville, LG was living with his biological father in Kunkletown, Pennsylvania, and was attending school there. (ECF No. 53, at ¶ 8).

14-16, 18). So, Cressman offered to pick LG up from his home, and Plaintiff agreed to have her do so. (Id. at ¶¶ 16-17). After permitting LG to work for Cressman, Plaintiff attempted to contact TMS Principal Jessica Stover ("Stover") to inquire about Cressman, but was unable to reach her until late in the summer of 2018. (Id. at ¶ 20).

Sometime in the first half of the summer, Plaintiff learned of a rumor from her older daughter, OS, that Cressman had been moved from the high school to TMS due to inappropriate relationships with students who had reached the age of maturity. (Id. at ¶ 23). After she was unable to contact Stover regarding the rumor, Plaintiff talked to Cressman directly and, after Cressman adamantly denied the rumor, Plaintiff believed her. (Id. at ¶¶ 24-25). Thereafter, Plaintiff and Cressman developed a close personal friendship and Cressman became "like an aunt" to LG and his sisters. (Id. at ¶¶ 28-31).

LG worked for Cressman four to five days a week during the summer of 2018. (Id. at ¶ 22). At LG's request, his friend, ZG, was also hired by Cressman to work with LG over the summer. (Id. at ¶ 21; ECF No. 68, at ¶ 101). Plaintiff allowed LG to go with Cressman to a trampoline park in Pittsburgh, Pennsylvania, and on other "all-day trips" during the summer. (Id. at ¶ 34). In early August 2018, a parent contacted Stover to express her concern about Cressman's time with LG. (Id. at ¶ 36). On August 7, 2018, Stover contacted ZG's mother regarding a concern she heard from a staff member about seeing Cressman and LG "outside of school a lot," and LG's mother advised Stover that Cressman "was spending a lot of time with [LG] and it just felt weird," and that Cressman "rides dirt bikes with him and 4-wheelers," and that she "saw them fishing together," as well. (ECF No. 68, at ¶¶ 109-110). Later the same day, Cressman contacted Stover, inquiring if Stover was contacting parents about her. (Id. at ¶ 111;

3

ECF No. 77-4, Stover deposition transcript, at p. 86). Cressman informed Stover that LG had done work for her at her house and that she "always got permission from parents for anything." (ECF No. 53, at ¶ 38).

Shortly before the beginning of the next school year, on August 31, 2018, Plaintiff was at the school administration building for a meeting concerning one of her children. (Id. at ¶ 39). After the meeting, Plaintiff and Stover spoke in a nearby office about Cressman, at which time Plaintiff acknowledged that LG had worked for Cressman over the summer and assured Stover that she had absolutely no concern about LG spending time with Cressman. (Id. at ¶¶ 40-41; ECF No. 68, at ¶ 115).

On September 6, 2018, LG was sitting with a group of his friends, including ZG, TT, and AV, at a lunch table when a verbal altercation ensued among them, during which LG demanded that his friends stop spreading rumors that he was having a sexual relationship with Cressman. (Id. at ¶ 43). As a result of the altercation, TASD Superintendent Karen Jez ("Jez") conducted a Title IX investigation during which all four boys were interviewed. (Id. at ¶¶ 47-48; ECF No. 68, at ¶ 123). During his interview, LG revealed, among other things, that Cressman had been driving him home from school, at which point he was instructed by Jez that he could no longer ride with Cressman. (ECF No. 68, at ¶ 123a). In addition, ZG's sister, JG, disclosed that Cressman had allowed ZG, who was only fourteen years old, to drive her truck home from Ed Burns Tire Shop over the summer. (Id. at ¶ 123e; ECF No. 53, at ¶ 53).

During the investigation, the TASD administrators also interviewed Cressman. Before her interview, Stover advised Jez that several members of the TMS football team had witnessed Cressman driving LG home from school on September 5, 2018. (Id. at ¶ 124). Cressman initially

4

refused to meet with the administrators without a union representative present. (Id. at ¶ 125). After the representative arrived, the interview began and Cressman essentially confirmed everything that had already been reported to TASD about her conduct: she hired LG and ZG over the summer, she had taken them and her niece to a trampoline park in Pittsburgh, she and LG had ridden dirt bikes and four wheelers together at her family's farm, and she had driven LG home from school "most days." (Id. at ¶ 130).

The next day, September 7, 2018, Principal Stover and Assistant Principal Houck recalled ZG to the office to ask him additional questions. (Id. at ¶ 135). During this interview, ZG confirmed, *inter alia*, that LG "just completely changed since he started working for" Cressman; that Cressman had offered to give LG $500 toward purchasing a dirt bike, but that he could not tell Cressman's husband about it; that LG told ZG that he talked frequently with Cressman in Snapchat; and that Cressman had ZG drive her truck, but told him not to tell LG about it. (Id. at ¶ 136). On the same day, Stover and Houck also met with ZG's mother, who confirmed that Cressman allowed ZG to drive her truck, though he was underage and unlicensed. (Id. at ¶ 138). In response, Houck and Stover explained to ZG's mother that ZG was "definitely saying a lot and [was] the main culprit to things being said…, and that they had told him that he needs to stop talking about these things or he [was] going to get himself in some trouble." (Id. at ¶ 139)

Following the Title IX investigation, Jez called the Crawford County Children and Youth Service ("CYS") Childline service to report the concerns about Cressman's relationship with LG and her allowing ZG to drive her truck. (ECF No. 53, at ¶ 54). Jez reported all statements made by the students at the lunch table, Cressman's contact with LG and the other boys over the

summer, parents' concerns about Cressman's conduct with LG, Cressman's driving LG to and from school, and Cressman's allowing ZG to drive her vehicle. (Id. at ¶ 56). After not receiving an immediate response from CYS, Jez contacted the Titusville Police Department ("TPD") to inquire about the status of her Childline report and Cressman's allowing ZG to drive her truck. (Id. at ¶¶ 57-58). The TPD then contacted Pennsylvania State Police ("PSP") Barracks Corporal BP, who suggested that the delay in responding to Jez may have been due to an internal "mix up" at CYS. (Id. at ¶¶ 59-60).

On September 10, 2018, Jez wrote a memo to Cressman outlining TASD's social media policies and directing her as follows:

1. Immediately stop driving [LG] and all other students anywhere,
2. Never be alone with [LG].
3. Immediately stop confronting other students about the rumors. Instead, you should report what you hear to the building Principals so they can handle the matter.
4. If you have friended students on social media sites, immediately unfriend them and stop all other forms of outside electronic communications with [LG] and other students.

(ECF No. 68, at ¶ 141). Cressman took the next day off "because she was struggling with the situation." (Id. at ¶ 142). She reported to school the following day "angry/upset" and "left at the end of the day obviously mad about something." (Id. at ¶ 143). The next day, September 13, 2018, Cressman took a sick day and LG missed school that day as well with an "unlawful absence." (Id. at ¶¶ 144-45).

On or about September 19, 2018, a formal "24 Hour Notice" report of Jez's complaint was finally generated and the CYS investigation began. (ECF No. 53 at ¶ 61). CYS caseworker "KH" started her investigation by visiting LG at school to "assure his safety at home." (Id. at ¶

6

70). She then conducted a home visit with Plaintiff, LG's two sisters, and LG's stepfather, and was told that "Ms. Cressman was not only a very good friend of the family" but all three of the children told KH they referred to Cressman as "Aunt Ro" and that "she was an emergency contact for" the children. (Id. at ¶ 71).

On September 21, 2018, Cressman's partner teacher in the physical education department, Tim Miller ("Miller"), informed Houck that Cressman was "still transporting [LG] to and from school," and called Jez to express his concerns. (Id. at ¶ 62; ECF No. 68 at ¶ 146). Jez encouraged Miller to call CYS Childline if he believed there was reason to suspect abuse, and Miller called Childline that day to report Cressman's conduct. (ECF No. 53, at ¶ 63, 65; ECF No. 68, at ¶ 150). As a result, at around 1:00 pm on September 21, 2018, CYS called TASD and directed them to put a Safety Plan in place for Cressman for at least sixty days, mandating that a second adult be present with Cressman at all times during the school day when she was with students. (ECF No. 53, at ¶ 66; ECF No. 68, at ¶ 151).

On September 24, 2018, Stover told Cressman about the Safety Plan and Cressman became very upset and stated that she was leaving and that she would be contacting an attorney. (Id. at ¶ 154). Coincidentally, LG left school that afternoon as well. (Id. at ¶ 155). On the same day, TASD filed an Educator Misconduct Report with the Pennsylvania Department of Education regarding Cressman's driving of LG. (ECF No. 53, at ¶ 69).

Also on September 24, 2018, a certified forensic interviewer, "LP", conducted a forensic interview of LG that was observed by CYS caseworker KH and Crawford County District Attorney Paula Digiacomo. (Id. at ¶ 72). During the interview, LG "talked about his involvement with the Cressman family and the things he did, but made no disclosures regarding any kind of

inappropriate behaviors at that time." (Id. at ¶ 74). KH recalled "[e]veryone was on the same page, that there was nothing inappropriate," the "relationship was strictly family/friend," and "[t]here was [sic] all kinds of factors there that just didn't make sense for it to be an abuse, especially during the interview when [LG] denied every ounce of inappropriateness." (Id. at ¶ 75). In addition, LP was "very confident that [LG] was truthful throughout this interview" and he had "no reason … not to believe [LG]. (Id. at ¶¶ 77-78). And Plaintiff testified that Digiacomo told her "that it was one of the few times that she ever felt a hundred percent that there was nothing going on." (Id. at ¶ 79). Digiacomo also told the PSP "there is absolutely nothing to this case. Cressman and [LG's] mother are best friends." (Id. at ¶ 80). The PSP spoke to Cressman by phone but did not follow up on an in-person interview after speaking with Cressman's attorney and Digiacomo. (Id. at ¶ 81).

On October 2, 2018, Miller once again saw Cressman driving LG in her vehicle and confronted her about trying to hide it from him, and Cressman responded by calling Miller a snitch and berating him "with 'f' words." (ECF No. 68 at ¶ 158). Both Miller and Cressman reported the incident to Jez; however, no specific discipline was given Cressman with regard to the incident. (Id. at ¶¶ 159-160).

On October 10, 2018, CYS notified Jez by email that its investigation resulted in a determination that the allegations of abuse of LG by Cressman were "unfounded." (Id. at ¶ 86). The next day, Stover wrote to Jez advising her that LG's mother had consented to Cressman transporting LG to and from school. (ECF No. 68 at ¶ 164). On October 17, 2018, Jez issued a memo to Cressman and Union President Fred Smith confirming that TASD would ***not*** enforce its policy prohibiting teachers from driving students against Cressman and LG, because of the fact

that the investigation was unfounded and Plaintiff was giving her permission, even though Jez "wasn't happy about it." (Id. at ¶ 168; ECF 77-6, at p. 29). Stover acknowledged that she also was not "comfortable" with this decision because she did not feel that Cressman had a "normal relationship between teacher and student" with [LG]. (Id. at ¶ 170). Subsequently, on November 12, 2018, Stover directed that LG be placed back into Cressman's advisory, after having already discussed the change with Cressman, despite Jez's concern that CYS's "unfounded" determination was a "mistake." (ECF No. 68 at ¶¶ 172-73).

On May 3, 2019, Cressman went missing from her home and attempted suicide by overdose, after having left a suicide note for her husband. (ECF No. 53 at ¶ 91). In trying to locate her, Cressman's husband found text messages on Cressman's iWatch indicating a sexual relationship had occurred between her and LG. (Id. at ¶ 92). Also while Cressman was missing, LG became upset and confessed to Plaintiff that Cressman had been sexually abusing him in secret since September 2018. (Id. at ¶ 93). This was the first time LG had reported this abuse to anyone after having consistently denied it previously. (Id. at ¶ 94). LG admitted that Cressman had been pressuring him to lie to investigators about their relationship and even took a gun out of a nightstand in her bedroom and told LG that "if you ever tell anyone, I will kill you and kill myself before the cops can get me." (ECF No. 68 at ¶ 185).

Both Cressman and LG subsequently confirmed that the sexual contact between them occurred at Cressman's home or family farm, and at Plaintiff's home. (ECF No. 53 at ¶ 95). Cressman was ultimately convicted of three counts of Statutory Sexual Assault on February 16, 2021, and sentenced to serve five to ten years in prison. (Id. at ¶ 96; ECF No. 58-26).

9

### C. Discussion

#### 1. Fourteenth Amendment Deliberate Indifference

The Third Circuit has recognized that "a teacher's sexual molestation of a student is an intrusion of the schoolchild's bodily integrity" in violation of the Fourteenth Amendment, and that a student can sue a school district under 42 U.S.C. § 1983 for failing to protect him from sexual abuse by staff. Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 726-27 (3d Cir. 1989), cert. denied, 493 U.S. 1044 (1990).

"To establish liability under Section 1983 plaintiff must show that (1) the school district's policy, practice, or custom played an affirmative role in bringing about the sexual abuse and (2) the school district acted with deliberate indifference to that abuse." Doe v. Boyertown Area Sch. Dist., 10 F.Supp.3d 637, 650 (E.D. Pa. 2014), citing Black by Black v. Indiana Area Sch. Dist., 985 F.2d 707, 712 (3d Cir. 1993) and Stoneking, 882 F.2d at 725. Here, Defendants assert that Plaintiff "has not pointed to any policy, practice or custom that played an affirmative role in Cressman's abuse of LG" and "has not pointed to a single instance of deliberate indifference." (ECF No. 72, at p. 6).

In order to succeed on a Section 1983 policy, practice, or custom claim, the plaintiff must demonstrate that "school officials … maintain[ed] a custom, practice or usage that communicate[d] condonation or authorization of assaultive behavior." Dipippa v. Union Sch. Dist., 819 F.Supp.2d 435, 441 (W.D. Pa. 2011), citing Stoneking, 882 F.2d at 730) (internal quotations omitted). Additionally, "a plaintiff must establish that a supervisory official or final policy maker of the school district, with actual knowledge of similar conduct in the past, acted with deliberate indifference in response thereto." Id., citing Gottlieb v. Laurel Highlands Sch.

Dist., 272 F.3d 168, 176 (3d Cir. 2001).

Because a school district's "[l]iability under § 1983 must stem from policy making authority," the plaintiff is required to identify an official who has "final, unreviewable discretion to make a decision or take action" who knew or had reason to know of the abuse. Id. at 442, citing Kneipp v. Tedder, 95 F.3d 1199, 1213 (3d Cir. 1996). If an employee's action is subject to discretionary review, the employee is not a final policymaker under § 1983.[4] Brennan v. Norton, 350 F.3d 399, 428 (3d Cir.2003). In Pennsylvania, the final policy maker for a school district is typically the school board or the superintendent. See 24 Pa. Stat. Ann. §§ 5–508, 5–510, 5–514, 10–1081(superintendent duties); McGreevy v. Stroup, 413 F.3d 359, 369 (3d Cir. 2005). In this case, TASD's final policy maker would, thus, be Superintendent Jez.

"The courts have noted three scenarios in which a government employee's actions, or in this case, school district employee's, actions may be deemed to be the result of a policy or custom of the entity that subjects the school district to § 1983 liability: (1) when an appropriate officer or entity promulgates a statement of policy and the employee's act is an implementation of that policy; (2) when the act of the policymaker violates federal law; and (3) when a policymaker fails to act affirmatively despite the obvious need for action to control agents of the government." Dipippa, 819 F.Supp.2d at 442, citing Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 584 (3d Cir.2003). Plaintiff's claims against TASD appear to implicate the third

---

[4] Though Plaintiff raises a number of allegations regarding actions that were taken by Stover, as TMS Principal, Stover acknowledged during her deposition that she had no independent authority to hire or terminate an employee or to take disciplinary action against an employee. (ECF No. 77-4, at pp. 26-27). So, it cannot be said that Stover had final, unreviewable discretion to take action as a final policymaker regarding disciplinary matters. As a result, any alleged actions taken by Stover are not attributable to TASD for the purpose of establishing liability under Section 1983.

11

scenario.

In particular, Plaintiff argues that "TASD implemented a practice and custom of refusing to enforce existing child-protection policies against Cressman." (ECF No. 62, at p. 26). Specifically, Plaintiff points to Jez's October 17, 2018 memorandum to Cressman and Union President Fred Smith confirming that TASD would *not* enforce its policy prohibiting teachers from driving students against Cressman and LG. Plaintiff essentially argues that TASD, through Jez, not only failed to take affirmative action to enforce the district's policy prohibiting teachers from transporting students but, in fact, openly conceded that Cressman could continue driving LG to and from school despite the existence of the policy, which was aimed at protecting students. In addition, Plaintiff argues that Jez failed to ensure that her prior written directive that Cressman stop texting LG was being followed, thus furthering the district's pattern or practice of "exempting" Cressman from complying with its "child protection policies." (Id. at p. 27). Also, in furtherance of this "policy" favoring Cressman, Plaintiff points out that LG was placed back in her advisory in November 2018, thus reestablishing Cressman's access to LG during school hours.

However, Plaintiff has failed to show how such a pattern, practice or policy "played an affirmative role in bringing about" Cressman's sexual abuse of LG, or otherwise "communicate[d] condonation or authorization of assaultive behavior," which is necessary to establish liability under Section 1983. Doe, 10 F.Supp.3d at 650; Dipippa, 819 F.Supp.2d at 441. In particular, Plaintiff has produced no evidence of record to show that TASD had any knowledge of past or present abusive or assaultive behavior by Cressman at the time the alleged policy or practice was adopted. Quite simply, the school district cannot be held responsible for

furthering, condoning or authorizing sexually abusive or assaultive behavior that it knew nothing about. Jez's testimony that she "believed" CYS "made a mistake" when it found the claims against Cressman unfounded, because "it appeared that [the relationship between Cressman and LG] could be inappropriate," does not establish any actual knowledge of sexual abuse on her part. It merely indicates her belief and supposition, from which the Court cannot infer knowledge. See Kobrick v. Stevens, 2017 WL 3839946, at **8-9 (M.D. Pa. Sept. 1, 2017), aff'd 763 Fed. Appx. 216 (3d Cir. 2019) ("courts cannot infer knowledge based on unsubstantiated rumors or suspicion…. Courts routinely hold that, without more, the mere fact of a teacher spending time with a student is not enough to raise the specter of potential sexual abuse").

Indeed, even an objective standard fails. The evidence of record would not lead a factfinder to conclude that Jez "should have known" or "had reason to know" of Cressman's sexual abuse of LG at the time of adopting the policy or practice alleged by Plaintiff, because both CYS and the PSP had already informed Jez that, based on their extensive investigations, which included a forensic interview of LG, the allegations of abuse were unfounded and there were no grounds for any further criminal investigation. In short, there is no objective basis to conclude that Jez had either actual or constructive knowledge of abuse when she established the "policy" of "exempting" Cressman from application of the student-protection policies related to transporting students and communicating with students by social media.

Nonetheless, even if Plaintiff could establish the first prong of her Fourteenth Amendment claim against TASD, she is unable to prove that TASD demonstrated deliberate indifference to Cressman's sexual abuse of LG.

"In order to establish deliberate indifference on the part of the defendant, something more

13

culpable [must be shown] than a negligent failure to recognize [a] high risk of harm to [the victim]." Black, 985 F.2d at 712-13, citing Colburn v. Upper Darby, 946 F.2d 1017, 1025 (3d Cir. 1991) (internal citations and quotations omitted). Specifically, to show deliberate indifference to a risk of sexual abuse to students, a plaintiff must demonstrate the school knew about past violations and its failure to take precautions against future abuse contributed to [the victim's] injury. See Bielevicz v. Dubinon, 915 .2d 845, 851 (3d Cir. 1990). First, as noted above, TASD had no knowledge of any actual sexual abuse violations in Cressman's past. This fact is undisputed. However, as to TASD's precautions against future abuse, Plaintiff asserts that "the TASD administration made a single report to Childline on September 7, 2018, relaying what multiple students had told them about Cressman's relationship with LG." (ECF No. 62, at p. 21). Plaintiff's assertion dramatically understates TASD's actions.

  The undisputed facts of record evidence show that, once Jez had obtained knowledge of various facts that revealed evidence of an inappropriate teacher-student relationship between Cressman and LG, she promptly reported Cressman's conduct to CYS on September 7, 2018. In her report, Jez included a number of facts she had uncovered during her Title IX investigation of the lunchroom altercation among LG and his friends. She then followed up with a memo to Cressman on September 10, 2018, directing her to stop the behaviors that prompted the report. Then, after not receiving an immediate response from CYS, Jez contacted the Titusville Police Department and then the PSP to inquire about the status of her report. This prompted the filing of a formal "24 Hour Notice" report by the PSP that commenced a CYS investigation on or about September 19, 2018. A couple days later, on September 21, 2018, Jez encouraged Miller to contact the CYS Childline to report the fact that he saw Cressman driving LG to and from

school. On the same day, at the direction of CYS, Jez put in place a safety plan that required a second adult to be present with Cressman at all times during the school day when she was with any students. Then a few days later, on September 24, 2018, TASD filed an Educator Misconduct Report with the Pennsylvania Department of Education regarding Cressman's driving of LG ("PDE Report").

All of the foregoing undisputed facts evidence appropriate affirmative actions that were taken by TASD during the CYS and PSP investigations, to address concerns regarding Cressman's inappropriate relationship with LG. Nonetheless, Plaintiff's assertion of deliberate indifference principally calls into question TASD's actions that took place after the investigations were completed.[5] Primarily, Plaintiff challenges TASD's decisions to (1) remove all safety procedures related to Cressman after CYS's "unfounded" determination was announced on October 10, 2018; (2) allow Cressman to drive LG alone in her vehicle, pursuant to Jez's written memorandum of October 17, 2018; and (3) place LG back in Cressman's advisory on November 12, 2018. (ECF No. 62, at p. 22). All of these decisions are called into question by Plaintiff in light of Jez's professed "belief" that CYS "made a mistake" in finding

---

[5] Plaintiff also challenges a few *inactions* of TASD during the pending investigations that are put forth as evidence of the school district's deliberate indifference to Cressman's sexual abuse of LG. These inactions all relate to TASD's failure to report Cressman's refusal to comply with the district's written instruction to stop driving LG and to stop spending time alone with him. (ECF No. 62, at p. 22). However, as recognized in Douglas v. Brookville Area Sch. Dist., 826 F.Supp.2d 329, 362-63 (W.D. Pa. 2011):

> The District's 'deliberate indifference' as to whether its own policies were being enforced is not the same 'indifference' that is relevant to the inquiry applicable under § 1983….A teacher's decision to provide a student with a ride to and from school does not inherently threaten the student's welfare. Indeed, there may be instances where such an arrangement would provide a student with the safest means of transportation. Consequently, the District's 'indifference' to the requirements of [its policy regarding approved transportation of students] cannot be equated with its alleged 'indifference' to [the victim's] constitutional rights.

that the allegations against Cressman were "unfounded." In Plaintiff's words, "[a]cting on behalf of the school district, Superintendent Jez chose to implement a policy of deliberate indifference when she relied on a conclusion she believed to be wrong." (Id. at p. 23). However, this argument is untenable.

It bears repeating that there was no evidence of a sexual or intimate relationship between Cressman and LG at any time prior to Cressman's disappearance in May 2019. Before then, no one professed to have witnessed any inappropriate touching or sexual innuendo between the two, and LG adamantly denied the existence of any sexual conduct with Cressman on numerous occasions. Moreover, during the CYS and PSP investigations, Plaintiff and her children, including LG, insisted that Cressman was a close family friend who interacted with the family regularly, and was even called "Aunt Ro" by the children. This, together with the lack of any evidence of sexual contact, led both the CYS and PSP to conclude that there was nothing inappropriate about the relationship between Cressman and LG.

Indeed, the CYS caseworker, KH, noted that "[e]veryone [involved in the investigation process] was on the same page, that there was nothing inappropriate," the "relationship was strictly family/friend," and "[t]here was [sic] all kinds of factors there that just didn't make sense for it to be an abuse, especially during the interview when [LG] denied every ounce of inappropriateness." (ECF No. 68 at ¶ 75). ADA Digiacomo agreed, telling the PSP that "there is absolutely nothing to this case [because] Cressman and [LG's] mother are best friends," and even going so far as to tell Plaintiff "that it was one of the few times that she ever felt a hundred percent that there was nothing going on." (Id. at ¶¶ 79, 80).

In light of these findings, it cannot be inferred that Jez's subsequent lifting of the safety

16

plan[6] and her "concession" to allow Cressman to drive LG to and from school, with Plaintiff's express permission, evidenced deliberate indifference to known sexual abuse, despite Jez's professed "belief" that the findings were "mistaken." In this regard, the Third Circuit Court's decisions in Black and Kline ex rel. Arndt v. Mansfield, 255 Fed. Appx. 624, 628 (3d Cir. 2007) are particularly instructive.

In Black, parents of schoolchildren sued their school district, among others, after a school bus driver molested multiple schoolchildren over a number of years. 985 F.2d at 708-709. Parents of at least one of the children had brought their concerns to the district superintendent. When informed, the superintendent confronted the bus driver in the presence of parents and the child – a meeting during which the driver and the child denied any inappropriate conduct. After that meeting, both parents and the superintendent "became convinced that there had been no assault," and because neither parents nor the superintendent believed an assault had occurred, CYS was never contacted. Id. at 712. The plaintiffs "fault[ed] [the superintendent] for failing to conduct a more thorough examination and for failing to notify [CYS]" and alleged that "a more thorough investigation…would have identified [the bus driver] as a molester and thereby have prevented any further harm." Id. at 712-713. However, because the superintendent "respond[ed] promptly to the [parents'] complaint, [the bus driver] was confronted, and those who had been exposed to the known facts were convinced that no sexual abuse had occurred," the Third Circuit Court affirmed the district court's grant of summary judgment in favor of all defendants, concluding "that no rational trier of fact could find from [the superintendent's] response to the

---

[6] Importantly, the Court notes that, in its email informing Jez that the investigation regarding Cressman and LG was

17

[parents'] complaint that he was deliberately indifferent to whether children were molested on the bus." Id.

Similarly, in Kline, the plaintiff, by and through her mother, sued her school district, among others, after she had been sexually abused by a teacher, Mr. Mansfield, when she was in the seventh grade. 255 Fed. Appx. at 625. During the school year, the plaintiff frequently visited Mr. Mansfield's classroom before, during and after school, to the point where the seventh grade teachers met and issued a statement that plaintiff was not allowed to go to Mr. Mansfield's room "for any reason." Id. The relationship between the plaintiff and Mr. Mansfield became intimate and eventually sexual during the school year; however, the plaintiff admitted that neither she, nor her mother, complained to school officials about Mr. Mansfield's conduct. Furthermore, no official of the school district possessed actual knowledge of the intimate or sexual nature of the relationship. Id. "Instead, Kline based her claim on the knowledge that school officials possessed regarding the contacts between her and Mansfield." Id. at 628. As a result, the Third Circuit Court upheld the district court's grant of summary judgment in favor of the defendant school district, finding that "[plaintiff's] evidence does not create a material issue of fact that [the school district] was deliberately indifferent. At best, it shows that [the school district] might have been negligent in failing to recognize a high risk of harm." In so finding, the court noted that, "[u]nlike Stoneking, the record in this case did not show that the school officials had notice of any sexual misconduct." Id. at n. 5.

---

going to be "unfounded," the CYS expressed its "agreement with dropping the safety plan with Mrs. Cressman."

Notably, unlike in the present case, neither school district in the foregoing cases notified the authorities or initiated a CYS investigation in response to concerns raised about the perpetrator's conduct; yet no deliberate indifference was found. This is true even in Black, where there were actual allegations of sexual abuse, and in Kline, where the questionable behaviors all occurred on school property during school hours. Neither of these more egregious elements are present here. If the Third Circuit Court was led to conclude that no rational factfinder could find deliberate indifference in those circumstances, it certainly follows that no deliberate indifference is evident here.

### 2. State-Created Danger

To establish a claim of state-created danger, the Plaintiff must prove the following four elements:

1. The harm ultimately caused [by a state actor's conduct] was foreseeable and fairly direct;

2. A state actor acted with a degree of culpability that shocks the conscience;

3. The plaintiff was a foreseeable victim, or a member of a discrete class of persons subjected to the potential harm brought by the state's actions; and

4. A state actor affirmatively used his or her authority in a way that created a danger to the plaintiff or that rendered him more vulnerable to danger than had the state not acted at all.

Bright v. Westmoreland Cnty., 443 F.3d 276, 281 (3d Cir. 2006).[7]

---

[7] In opposing Plaintiff's state created danger allegations, TASD erroneously applies the four-part test against Cressman, as the presumed "state actor;" however, it is plain from Plaintiff's allegations that the appropriate state actor in this case is Superintendent Jez. This error, however, does not prevent the Court from reviewing Plaintiff's

Here, in light of the foregoing findings, we focus our analysis on whether the record supports a finding that TASD "acted with a degree of culpability that shocks the conscience." "The exact degree of wrongfulness necessary to reach the 'conscience-shocking' level depends upon the circumstances of a particular case." Miller v. City of Phila., 174 F.3d 368, 375 (3d Cir.1999). The Third Circuit has summarized the levels necessary to establish conscience shocking behavior as follows: (1) deliberate indifference; (2) gross negligence or arbitrariness that indeed shocks the conscience; or (3) intent to cause harm. Phillips v. Cnty. of Allegheny, 515 F.3d 224, 241 (3d Cir. 2008). Where, as here, "deliberation is possible and officials have the time to make 'unhurried judgments,' deliberate indifference is sufficient." Id., quoting Cnty. of Sacramento v. Lewis, 523 U.S. 833, 853 (1998). In this regard, the Third Circuit has defined "deliberate indifference" as requiring "conscious[ ] disregard [of] 'a substantial risk of serious harm.'" Ziccardi v. City of Phila., 288 F.3d 57, 66 (3d Cir.2002) (quotation omitted).

Because the Court has already determined that a rational factfinder could not find that TASD's actions were deliberately indifferent to Cressman's sexual abuse of LG, of which it had no knowledge, the same conclusion precludes a finding that TASD "acted with a degree of culpability that shocks the conscience." Thus, Plaintiff's state-created danger claim must also fail.

An appropriate Order follows.

---

allegations in the appropriate light.